STATE OF NORTH CAROLINA v. CURTIS LEVAN WADE

No. COA02-25

(Filed 31 December 2002)

**1. Evidence— testimony of defendant's ex-wife—shorthand statements of fact**

The trial court did not commit plain error in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case by failing to strike ex mero motu under N.C.G.S. § 8C-1, Rule 701 portions of the testimony of defendant's ex-wife including that defendant's drinking was the reason that he had molested, that defendant was a molester at heart, that defendant's other behavior was due to the fact he was drinking and was crazy, that there were signs that made her suspicious of defendant, and her sense that defendant only cultivated a boyfriend/girlfriend relationship with his daughter, because a careful reading of the testimony as a whole reveals that most, if not all, of the challenged testimony related to conclusions as to the mental state of defendant derived from observation of a variety of facts and circumstances making the testimony admissible as shorthand statements of facts.

**2. Evidence— hearsay—admission by party opponent**

The trial court did not commit plain error in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case by failing to strike ex mero motu the victim daughter's testimony that defendant said it

1

was his word against hers, because defendant's statement was admissible as an admission by a party-opponent.

**3. Evidence— hearsay—excited utterance—corroboration— state of mind—effect on listener**

The trial court did not commit plain error in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case by failing to strike ex mero motu the testimony of defendant's ex-wife concerning her child's report of defendant's sexual abuse of the child, because: (1) a young child's report of sexual abuse made between two and three days of the event is admissible under the excited utterance exception of N.C.G.S. § 8C-1, Rule 803(2); (2) the testimony was admissible as corroboration since the child testified to the events herself; and (3) the remaining portions of the challenged testimony were not offered for the truth of the matter asserted, but for the nonhearsay purposes of showing state of mind and effect on the listener.

**4. Evidence— hearsay—business records—medical records of sexual disease in child abuse case**

The trial court did not commit plain error in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case by failing to strike ex mero motu a witness nurse's testimony that both defendant and his victim daughter had been treated for gonorrhea when the witness did not treat defendant, because: (1) the testimony was based upon the contents of medical records maintained by the county health department during the normal course, scope, and business of the health department; and (2) medical records showing that defendant and the victim in a child abuse case were both treated for gonorrhea at approximately the same time is admissible as evidence with regard to the cause or source of the victim's disease.

**5. Appeal and Error— preservation of issues—failure to make assignment of error**

Although defendant contends the trial court committed plain error in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case by admitting under N.C.G.S. § 8C-1, Rule 404(b) the testimony of three of his alleged victims without making findings of fact as to the sufficient similarity and remoteness in time, this issue is dis-

missed because defendant failed to make findings of fact pursuant to N.C.G.S. § 8C-1, Rule 404(b) the basis of an assignment of error.

**6. Evidence— prior crimes or bad acts—sexual misconduct—state of mind—intent—motive—plan—opportunity**

The trial court did not err in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case by failing to give the jury a limiting instruction as to the N.C.G.S. § 8C-1, Rule 404(b) evidence concerning prior acts of sexual misconduct, because: (1) defendant failed to request a Rule 404(b) limiting instruction; and (2) evidence of prior acts of sexual misconduct may properly be admitted under Rule 404(b) to show a relevant state of mind such as intent, motive, plan, or opportunity.

**7. Constitutional Law— effective assistance of counsel—failure to object to testimony and evidence—failure to request limiting instruction**

A defendant in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case was not denied effective assistance of counsel even though his counsel failed to object to the expert testimony of a clinical therapist, failed to object to N.C.G.S. § 8C-1, Rule 404(b) evidence of prior acts of sexual misconduct, and failed to request limiting instructions, because defendant has failed to show that there would have been a different result in the proceedings.

**8. Evidence— expert testimony—victim in fact sexually abused—no plain error**

Although the trial court erred in an indecent liberties with a child, felonious child abuse by a sexual act, incest, statutory rape, and first-degree rape case by admitting expert testimony that the victim was in fact sexually abused, the error did not amount to plain error when the remaining evidence in the case is such that it is not probable the jury would have reached a different result including: (1) testimony from the victim that she had been sexually abused by defendant; (2) testimony from the two children of defendant's ex-wife who recounted, without objection, prior instances of abuse by defendant; (3) testimony from an expert witness that the victim exhibited characteristics of a victim of sexual abuse by a primary caretaker; and (4) evidence that the

victim and defendant had both been treated for the same sexually transmitted disease at about the same time.

Judge GREENE concurring in the result.

Judge MARTIN concurrs in the result and joins in the concurring opinion.

Appeal by defendant from judgment entered 27 June 2001 by Judge Benjamin G. Alford in Lenoir County Superior Court. Heard in the Court of Appeals 12 November 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Allison S. Corum, for the State.*

*Russell J. Hollers III, for defendant-appellant.*

EAGLES, Chief Judge.

Defendant, Curtis Levan Wade, appeals from judgment entered in Lenoir County Superior Court upon a jury verdict convicting him of four counts of taking an indecent liberty with a child; three counts of felonious child abuse by a sexual act; three counts of incest; two counts of statutory rape; and one count of first degree rape. Defendant was sentenced to life in prison.

The State's evidence tended to establish that defendant and Carol Jean Wade were married in 1980. At the time of her marriage to defendant, Carol Wade had two daughters from a previous relationship: "T," who was eight years old and "L," who was five. Both "T" and "L" lived with Carol Wade and defendant in Kinston, North Carolina. Carol Wade conceived another child, by defendant, soon after their marriage. Before this child was born, defendant "molested" "T" by fondling her. Carol Wade reported the incident to authorities and expelled defendant from the home. Carol Wade and defendant separated after this incident. Although the couple were not divorced until 2000, defendant never again lived with the family. Carol Wade gave birth to defendant's daughter, "A," on 19 November 1981. Defendant had no significant contact with "A" until she was approximately ten years old, when Carol Wade allowed defendant to have "visitation" with "A." Defendant visited with "A" "periodically" until she reached the age of twelve. At that point, defendant began a more regular routine of visitation.

"A" testified that during a visit with defendant when she was ten years old, defendant took her to Bill Fay Park in Kinston, North

Carolina. Once at the park, defendant led "A" down a nature trail where defendant exposed his erect penis and sat "A" on his lap, so that his penis was touching her between her legs. "A" did not report this incident.

During another visit when "A" was twelve years old, defendant took her to a video store where he rented a pornographic movie. Defendant then took "A" to his house where they watched the movie together. Before watching the movie, defendant removed both his and "A's" clothes so that they were both nude. During the movie, defendant fondled "A's" breasts and masturbated in front of her. Later, defendant engaged in vaginal intercourse with "A." "A" did not report this incident either.

Thereafter, defendant began regularly engaging in various forms of sexual intercourse with "A." "A" testified that she visited defendant virtually "every weekend" until she was seventeen years old. "A" further stated that she had sexual intercourse with defendant "every single time" she visited him. Sometimes this involved "oral sex" and "fondl[ing]," in addition to vaginal intercourse. However, defendant always penetrated "A" vaginally, ejaculated and never wore a condom. At one point, "A" was tested and treated for gonorrhea. Later, she learned that defendant had been treated for gonorrhea as well. On 23 October 1999, following yet another sexual encounter with defendant, "A" told Carol Wade that defendant had been "molesting" her. The following day, "A" and Carol Wade reported defendant to the Kinston Police.

Carol Wade testified that shortly before "A" was born, "T" told her that defendant had "molested" her. As a result, Carol Wade made defendant leave the home. Initially, Wade thought the incident with "T" occurred because defendant was a "heavy drinker." Consequently, Wade only allowed "A" to visit with defendant because he had stopped drinking. Notwithstanding this fact, Wade suspected that something improper might have been going on between defendant and "A" and on several occasions questioned "A" about her concerns. Each time, "A" denied that anything improper had occurred.

"T," now twenty-eight years old, testified that when she was eight years old, defendant took her into the bathroom of their home, put "vaseline on his penis" and tried to "put it inside [her]." "T" said she began to cry and defendant stopped. "T" said that she told her godmother about the incident, who in turn told her mother. "T" stated

further that defendant left and never returned to the home after this incident.

"E," the fourteen year old granddaughter of Carol Wade, testified that when she was eleven or twelve, defendant volunteered to babysit her at his house while Carol Wade was at work. While defendant was helping "E" with her hair, he rubbed his penis on her buttocks in a way that made her "uncomfortable." "E" told Carol Wade about the incident and never went to defendant's house alone again.

Barbara Hebert, a psychologist and clinical therapist at the Teddy Bear Child Advocacy Center in Greenville, North Carolina, also testified. Hebert testified that she performed "A's" initial "clinical intake" interview in December of 1999. "A" began counseling immediately following this interview. In June of 2000, Hebert took over "A's" case and continued counseling "A" approximately one hour each week until March of 2001. In order to assist in her therapy, Hebert had "A" complete a time-line of all of the events of sexual abuse she could recall. Hebert and "A" then discussed each event on the time-line. Hebert noted that the earliest events "A" described were known in the field as "preparatory grooming behaviors." Hebert also noted that "A" exhibited feelings of guilt, fault and fear; experienced problems with trust; confused boundaries between herself and others; suffered from decreased self-esteem; experienced difficulty in disclosing the incidents of abuse; and experienced conduct problems. "Based on her training and experience," Hebert opined that these symptoms were the result of "sexual abuse" because they "were consistent with those that we[re] see[n] in other victims of sexual abuse." Consequently, Hebert counseled "A" "as the victim of a long history of sexual abuse by her father."

Melanie Palmer, a licensed nurse and the Women's Health Supervisor for the Lenoir County Health Department, testified that health department records indicated that both defendant and "A" were tested and treated for gonorrhea in 1997: Defendant was treated on 8 January 1997 and 30 January 1997. "A" was tested on 25 February 1997 and received treatment on 12 March 1997.

Defendant denied all allegations of sexual abuse. Defendant testified that he believed the charges stemmed from his refusal to allow "A" to move in with her current boyfriend. Defendant was convicted and sentenced to life in prison. Defendant appeals.

Defendant first argues that the trial court committed plain error in admitting the expert testimony of Barbara Hebert. After careful review of the record and transcript, we find no error.

"The plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a 'fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done . . . .' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation omitted). "To prevail under a plain error analysis, a defendant must establish not only that the trial court committed error, but that absent the error, the jury probably would have reached a different result." *State v. Perkins*, 154 N.C. App. 148, 152, 571 S.E.2d 645, 648 (2002).

It has long been the law in North Carolina that "an expert medical witness may render an opinion pursuant to Rule 702 that sexual abuse has in fact occurred if the State establishes a proper foundation . . . ." *State v. Dixon*, 150 N.C. App. 46, 52, 563 S.E.2d 594, 598 (2002), *aff'd per curiam*, 356 N.C. 428, 571 S.E.2d 584 (2002). This requires the State to demonstrate that " 'the opinion expressed by the experts was really based upon their special expertise, or . . . that the experts were in a better position than the jury to have an opinion on the subject.' " *State v. Grover*, 142 N.C. App. 411, 414, 543 S.E.2d 179, 181 (2001) (quoting *State v. Trent*, 320 N.C. 610, 614, 359 S.E.2d 463, 465 (1987)), *aff'd per curiam*, 354 N.C. 354, 553 S.E.2d 679 (2001). Accordingly, "an expert cannot base his conclusions *solely* on the children's statements that they had been abused." *State v. Stancil*, 146 N.C. App. 234, 240, 552 S.E.2d 212, 215 (2001), *modified and aff'd per curiam*, 355 N.C. 266, 559 S.E.2d 788 (2002). Moreover, "in the absence of physical evidence to support a diagnosis of sexual abuse, expert testimony that sexual abuse has *in fact* occurred is not admissible because it is an impermissible opinion regarding the victim's credibility." *Dixon*, 150 N.C. App. at 52, 563 S.E.2d at 598 (emphasis added). However, "an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." *State v. Stancil*, 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002) (per curiam). An expert may also give an "expert opinion based on her examination of the child and based on her expert knowledge concerning abused children in general." *State v. Bailey*, 89 N.C. App. 212, 219, 365 S.E.2d 651, 656 (1988). " 'The fact that this evidence may support the credibility of the victim does not alone render it inadmissible.' " *Dixon*, 150

N.C. App. at 52, 563 S.E.2d at 598 (quoting *State v. Kennedy*, 320 N.C. 20, 32, 357 S.E.2d 359, 367 (1987)).

Defendant contends that Hebert's testimony was inadmissible because it was based "solely" on the victim's statements. Defendant bases this argument on the following portion of his cross-examination of Hebert:

Q: Ms. Hebert, what other sources of information did you have other than what ["A"] told you, ma'am, to base your opinion on?

A: My opinion about what?

Q: That she was a victim of some type of abuse.

A: The—I base all of my responses to a child on what they tell me. I do not consult other sources other than, I guess, her mother.

Q: Okay. So you based your opinion on what ["A"] told you?

A: Yes.

Q: And no independent corroboration, that is, nothing to independently corroborate what she was saying.

A: I did not research others.

Where "[t]he expert testimony . . . [is] based on the overall examination of the child during the course of treatment," it is not inadmissible as based "solely on the [victim's] statements." *Stancil*, 146 N.C. App. at 240, 552 S.E.2d at 216. The *Stancil* court noted five factors in support of its conclusion that the testimony was based on the overall examination of the child: (1) The "opinion was given by an expert in the field of child abuse or child investigation and interviews"; (2) The testifying expert "had conducted at least one interview with [the victim]"; (3) The testifying expert had "observed the child"; (4) The testifying expert had "noted [the victim's] symptoms and manifestations"; and (5) The testifying expert "was aware of [the victim's] account of the incident to others." *Id.*

Here, although Hebert was never tendered as an expert in the field of child abuse, she was the clinical therapist at Teddy Bear Child Advocacy Center. She had a masters degree in marriage and family therapy and had been working in that field for twelve years, counseling children who were victims of physical or sexual abuse, neglect or

domestic violence. In addition to performing the initial "clinical intake" interview of "A" in December of 1999, Hebert took over "A's" case in June of 2000 and counseled her approximately one hour per week until March of 2001. Moreover, Hebert testified to the various behavioral and psychological manifestations that "A" exhibited during her counseling sessions. Finally, Hebert testified that she "consulted" Carol Wade during the course of "A's" treatment.

Although the record is unclear as to whether or not Hebert was specifically made aware of "A's" account of the incidents to others; on the facts before us, this alone does not preclude the determination that Hebert's testimony was based on her overall examination of "A." Here, unlike *Stancil*, Hebert had the opportunity to observe and counsel "A" on a regular weekly basis for approximately ten months. We find it unlikely, given the testimony that was elicited, that Hebert would not have been made aware of "A's" account of the incidents to others. Therefore, we conclude Hebert's testimony was based on her overall examination of "A" during the course of treatment and not based solely on "A's" statements.

Defendant next contends that because there was no physical evidence of sexual abuse, Hebert's testimony was inadmissible as merely an attestation to "A's" credibility. Defendant bases this argument on the following:

Q: Ms. Hebert, what would you and ["A"] discuss during these particular sessions?

A: By that time she had been through some of the initial counseling stages with Ms. Burmeister. And she and I started to work on relationship issues that had come about as a result of being abused.

Q: What type of relationship issues did she have in your opinion that were a result of the abuse?

A: In general children who have had sexual abuse experiences, especially from a primary caretaker, someone that they love and trust, have problems with trust, problems with confused boundaries between themselves and other people, decreased self-esteem. They don't respect themselves. They have a difficult time valuing themselves and believing that other people should value them. And they make poor choices as a result of that by allowing other people to take advantage of them, by trying to please other people, and

sometimes conduct problems. ["A"] was experiencing all of those things at that time.

Q: And in your opinion were they a result of the sexual abuse she had been a victim of in the past?

A: Yes.

Q: Were you aware, Ms. Hebert, as a result of your counselling with ["A"] that the sexual abuse had began when she was around the age of ten and had continued for a number of years?

A: ["A"] and I—one of the activities that we did together in processing the abuse experiences she had had is that we did a time line and started from birth, worked forward—when was the first time that you remember something happening? And we worked through feelings and her inner—what she remembered of her inner processing during that time. And in that process, yes, she told me that she had first experienced abuse—I believe it was—and I'm going from my memory and not from the record. I don't want to contradict something, but eight or ten.

Q: And did she tell you who that abuse was from?

A: Yes.

Q: Who was that, Ma'am?

A: That was her father, Curtis Wade.

. . . .

Q: In your opinion, Ms. Hebert, based upon your training and education and your experience as a counselor at the Teddy Bear Center when you say that ["A"] had relationship issues, do you have an opinion as to the cause of those relationship issues?

A: I can't be definitive in saying that all of ["A's"] relationship issues would stem from the sexual abuse, but I can say that she had relationship issues that were consistent with those that we see in other victims of sexual abuse. So that almost certainly they at least in part relate back to the sexual abuse she experienced.

It is well settled that "an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and

whether a particular complainant has symptoms or characteristics consistent therewith." *State v. Stancil*, 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002). Our courts have also held that where child victims are examined by psychologists for purposes of " 'diagnosis and treatment of alleged sexual abuse, details of the offense, *including the identity of the offender*, provided by the child during such examination are generally admissible at trial.' " *State v. Youngs*, 141 N.C. App. 220, 225, 540 S.E.2d 794, 798 (2000) (citations omitted), *disc. review denied*, 353 N.C. 397, 547 S.E.2d 430 (2001).

Our reading of this testimony leads us to conclude that Hebert's second response described the general characteristics or traits exhibited by children who have been sexually abused by primary caretakers. Hebert ends this answer by giving her opinion that the manifestations she observed in "A" were consistent with "all" of those characteristics. Hebert next opined that these characteristics were the result of past sexual abuse and explained in her final response that this conclusion was based on the consistency between the manifestations exhibited by "A" and other victims of sexual abuse. Hebert next relayed what she had been told by "A" during the course of treatment, regarding some of the details of her abuse and the identity of her abuser. Therefore, while this testimony comes precariously close to that which has previously been held inadmissible by our courts, *see, State v. Trent*, 320 N.C. 610, 359 S.E.2d 463 (1987); *State v. Grover*, 142 N.C. App. 411, 543 S.E.2d 179 (2001), we conclude there was no error.

Here, unlike *Trent* and *Grover*, Hebert did not explicitly testify that "A" had in fact been sexually abused. Instead, Hebert stated that her overall conclusion was that "A's" manifestations were consistent with those exhibited by other victims of sexual abuse, which was proper under *Stancil*. Based on this consistency, Hebert further opined that these *manifestations* were the result of past sexual abuse. This is not the same as saying that "A" was in fact sexually abused. Rather, this testimony related to a conclusion based upon the witness's expert knowledge concerning abused children in general. Therefore, this testimony was permissible under *State v. Bailey*, 89 N.C. App. 212, 365 S.E.2d 651 (1988).

We are also mindful that this Court has previously allowed a treating psychologist to testify that a child had in fact been sexually abused. In *State v. Youngs*, 141 N.C. App. 220, 540 S.E.2d 794 (2000), this Court held that "an expert may testify to his opinion that a child has been sexually abused as long as this conclusion relates to a diag-

nosis based on the expert's examination of the child during the course of treatment." *Id.* at 227, 540 S.E.2d at 799. The *Youngs* court found the following "testimony established a sufficient foundation to permit the trial court to allow [the psychologist's] expert opinion to be admitted into evidence": (1) The witness testified to being "a professional psychologist in private practice . . . specializing in children and adolescents"; (2) The witness "was accepted as an expert witness in the field of child psychology"; (3) The witness "treated [the victim] on at least forty-five occasions prior to trial" and (4) the witness's opinion was "[b]ased on her observations during treatment, her professional experience, and the report of [the examining physician which concluded that the victim had sustained vaginal, oral and possibly anal penetration.]" *Id.* at 227-28, 540 S.E.2d at 799.

Here, we have already concluded that Hebert's testimony was based on her overall examination of "A" made during treatment. In addition, Hebert testified that she was a professional psychologist with twelve years experience specializing in the treatment of abused children; that her opinion was based on her training, education and experience as a counselor; and that she counseled "A" on a weekly basis for approximately ten months, which equates to approximately forty, hour-long sessions prior to trial. Hebert also testified concerning her observations made during the course of "A's" treatment. Although Hebert was not specifically tendered and accepted as an expert in the field, defendant concedes in his brief that Hebert was an expert. Even though there was no medical report indicating that there had been "penetration"; the mere fact that no physical examination was performed on the victim does not negate the probative value of the testimony and render the expert incompetent to testify.

In *State v. Stancil*, 146 N.C. App. 234, 552 S.E.2d 212 (2001), *modified on other grounds and aff'd per curiam*, 355 N.C. 266, 559 S.E.2d 788 (2002), this Court found a psychologist competent to testify despite the absence of physical evidence of abuse. The *Stancil* court distinguished *Grover* on grounds that in *Stancil*, "the nature of the sexual act (cunnilingus) was not likely to leave forensic evidence, particularly after the child used the bathroom." *Id.* at 240, 552 S.E.2d at 215. Notwithstanding that fact, the *Stancil* court concluded that the expert's testimony was admissible as "based on the overall examination of the child during the course of treatment," pointing out that "[t]he child not only was consistent in relating facts during each interview but also exhibited physical symptoms of trauma such as com-

pressed speech, hand-wringing, shaking, nervousness and anxiety." *Id.* at 240, 552 S.E.2d at 216.

Here, like *Stancil*, some of the acts alleged by "A," *i.e.*, cunnilingus and fellatio, involved acts that were not likely to leave forensic evidence. Furthermore, although "A" alleged acts that were likely to yield physical evidence, it is unlikely that a physical examination would have resulted in the recovery of any evidence with forensic value, given the length of time that had elapsed between the offenses and their reporting. It is also noteworthy that here, like *Stancil*, there was other corroborating physical evidence that indicated abuse: the medical records which indicated that both "A" and defendant were treated for a sexually transmitted disease at approximately the same time during 1997. On these facts, we conclude that Hebert's opinion concerning whether "A" had been sexually abused was admissible, as it related to a diagnosis based on her examination of "A" during the course of treatment.

Finally, we note that the scope of our review is limited to that of plain error. In *Stancil*, our Supreme Court concluded that "although the trial court's admission of the challenged portion of Dr. Prakash's testimony was error, it did not rise to the level of plain error" because "[t]he overwhelming evidence against defendant" lead[] . . . to [the] conclu[sion] that the error committed did not cause the jury to reach a different verdict than it otherwise would have reached." *Stancil*, 355 N.C. at 267, 559 S.E.2d at 789. After carefully reviewing the entire record, we cannot say that defendant has shown that the jury probably would have reached a different verdict. Even if the questionable portions of Hebert's testimony were stricken, the jury would still have before it: (1) the testimony of the victim; (2) corroboration of the victim's account; (3) evidence of defendant's pattern of misconduct; (4) evidence of the victim's psychological symptoms; (5) the conclusion of an expert that these symptoms were consistent with those exhibited by victims of sexual abuse; and (6) medical records indicating that both the victim and defendant were treated at approximately the same time for a sexually transmitted disease. Since there was overwhelming evidence against defendant, none of the alleged errors, if any, rises to the level of plain error. Accordingly, this assignment of error is rejected.

[1] Defendant next argues that the trial court committed plain error when it failed to strike portions of Carol Wade's testimony *ex mero motu*. Defendant contends the following portions of Carol Wade's testimony were inadmissible under Rule 701: (1) her initial opinion that

defendant's "drinking was the reason that he . . . had molested . . . ["T"]"; (2) her ultimate conclusion that defendant "was a molester at heart"; (3) her conclusion that some of defendant's other behavior was because he was "drinking and crazy"; (4) her testimony concerning the "signs [that] made her suspicious of [defendant]"; and (5) her sense that "[defendant] only cultivated a boyfriend/girlfriend relationship with his daughter". Although defendant made no objections at trial, he now argues that the trial court's failure to strike the testimony *ex mero motu* constitutes plain error. After careful review of the whole record, we disagree.

Rule 701 provides that a lay witness may testify in the form of opinions or inferences, provided they are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2001). However, nothing in Rule 701 bars "evidence that is commonly referred to as a 'shorthand statement of fact.' " *Id. See,* Commentary.

> [Our courts have] long held that a witness may state the 'instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time.' Such statements are usually referred to as shorthand statements of facts.

*State v. Brown,* 350 N.C. 193, 203, 513 S.E.2d 57, 64 (1999) (citations omitted).

A careful reading of the testimony as a whole reveals that most, if not all, of the challenged testimony related to conclusions as to the mental state of defendant derived from observation of a variety of facts and circumstances. Therefore, the testimony was admissible as shorthand statements of facts. When taken out of context, Wade's statement that defendant was a "molester at heart" gives us some pause; when read in context, we cannot say that absent this statement, the jury probably would have reached a different result. Accordingly, this assignment of error is rejected.

[2] Defendant next argues that the trial court committed plain error by allowing "A" to give the following testimony:

Q: Why didn't you think anyone would believe you?

A: Because of what my father said.

Q: What had your father told you about someone believing you?

A: *He said that it would be his word against mine and that no one would believe me.*

(Emphasis added.) Although defendant did not object at trial, he now contends that his statement to "A" was inadmissible hearsay and the trial court committed plain error by failing to strike the testimony *ex mero motu*. We disagree.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2001). "A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement . . . ." N.C. Gen. Stat. § 8C-1, Rule 801(d)(A) (2001). Here, defendant's statement was admissible as an admission by a party-opponent. Therefore, defendant's argument is without merit.

**[3]** Defendant makes the same argument with respect to certain portions of Carol Wade's testimony. Specifically, defendant contends the following was inadmissible as hearsay: (1) "E" "told her that [defendant] had done something to her that made her feel uncomfortable"; (2) "A's" boyfriend, Gene, "had told ["A"] to tell Carol 'what [defendant] been doing to you' "; (3) The police department told her twenty years earlier that "T's" allegations would be "[defendant's] word against hers"; (4) "E" had told her that "she had seen ["A"] nude in front of [defendant]." After careful review of the record, we disagree and find no error.

Statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" are not excluded as hearsay. N.C. Gen. Stat. § 8C-1, Rule 803(2) (2001). Our Supreme Court has held that when a young child's report of sexual abuse is made "between two and three days of the event," those statements are admissible under the excited utterance exception of Rule 803(2). *State v. Smith*, 315 N.C. 76, 90, 337 S.E.2d 833, 843 (1985).

Here, "E" testified that she "immediately" told a neighbor and her grandmother, Carol Wade, about the incident. Therefore, "E's" statement was admissible as an excited utterance. The testimony was also admissible for corroboration since "E" testified to the events herself. A careful reading of the testimony reveals that the remaining portions of the challenged testimony were not offered for the truth of the mat-

ter asserted, rather they were offered for the non-hearsay purposes of showing state of mind and effect on the listener. Accordingly, this argument is also rejected.

**[4]** Defendant next argues that the trial court committed plain error by permitting Melanie Palmer to testify that both defendant and "A" had been treated for gonorrhea. Defendant contends this testimony was inadmissible as hearsay because Palmer did not "treat" him. Defendant further contends that the evidence was irrelevant and the trial court committed plain error by failing to strike the testimony *ex mero motu*. We disagree.

Rule 803 of the North Carolina Rules of Evidence provides that the following are not excluded by the hearsay rule:

(4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

. . . .

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

N.C. Gen. Stat. § 8C-1, Rule 803 (2001).

Here, Palmer's testimony was based upon the contents of medical records maintained by the Lenoir County Health Department. Palmer testified that the records were "based upon information that individuals give . . . for treatment"; "the notations [are] made when the individuals come into the health department" by "people at the health department"; and that the "records [are] maintained during the normal course, scope, and business of the Lenoir County Health Department." This testimony established a sufficient foundation for

**STATE v. WADE**

[155 N.C. App. 1 (2002)]

the records and their contents to be admitted into evidence. Therefore, this assignment of error is without merit.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2001). Medical records showing that defendant and the alleged victim in a child sexual abuse case were both treated for gonorrhea at approximately the same time is "admissible as evidence with regard to the cause or source of [the victim's] disease." *State v. Efird*, 309 N.C. 802, 806, 309 S.E.2d 228, 230 (1983).

Here, Palmer testified that "gonorrhea is a sexually transmitted disease" and "the only way to get it is [through] intercourse or oral sex" with another individual who has gonorrhea. Therefore, evidence that both were infected with gonorrhea is relevant to show that "A" had sexual contact with an infected person and defendant was an infected person. Accordingly, this assignment of error is without merit.

**[5]** Defendant next argues that the trial court committed plain error by admitting the testimony of "A," "T" and "E," pursuant to Rule 404(b), without making specific findings of fact as to "sufficient similarity" and "remoteness in time." The scope of appellate review "is confined to a consideration of those assignments of error set out in the record on appeal . . . ." N.C. R. App. P. 10(a). Here, defendant did not make the trial court's failure to make findings of fact pursuant to Rule 404(b) the basis of any assignment of error in the record. Accordingly, this issue is beyond the scope of our review.

**[6]** Defendant next argues that the trial court erred in failing to give the jury a limiting instruction as to the Rule 404(b) evidence. Defendant contends that even though a limiting instruction was not requested at trial, the trial court should have intervened *ex mero motu* and given a Rule 404(b) limiting instruction. We disagree.

"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly." N.C. Gen. Stat. § 8C-1, Rule 105 (2001) (emphasis added). It is the general rule that "[t]he admission of evidence which is relevant and competent for a limited purpose will not be held error in the absence of a request by

the defendant for a limiting instruction. 'Such an instruction is not required unless *specifically* requested by counsel.' " *State v. Stager*, 329 N.C. 278, 309, 406 S.E.2d 876, 894 (1991) (citations omitted).

Here, defendant failed to request a Rule 404(b) limiting instruction. Since evidence of prior acts of sexual misconduct may properly be admitted under Rule 404(b) "to show a relevant state of mind such as intent, motive, plan, or opportunity," *State v. Boyd*, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988), we conclude there was no error.

[7] Finally, defendant argues that he was deprived of a fair trial because of the ineffective assistance of his counsel. Defendant bases this argument on his trial counsel's (1) failure to object to the expert witness testimony of Barbara Hebert; (2) failure to object to the Rule 404(b) evidence; and (3) failure to request limiting instructions. Defendant contends that absent these errors, the jury would have reached a different result. We disagree.

> When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness. In order to meet this burden defendant must satisfy a two part test[:] 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*' . . . The fact that counsel made an error, even an unreasonable error, does not warrant reversal of a conviction unless there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings. This determination must be based on the totality of the evidence before the finder of fact.

*State v. Braswell*, 312 N.C. 553, 561-63, 324 S.E.2d 241, 248 (1985) (citations omitted).

After careful review of the evidence in light of the forgoing analysis, we conclude that defendant has not shown that there would have been a different result in the proceedings. Accordingly, this assignment of error is without merit. We hold that defendant received a fair trial, free from prejudicial error.

No error.

Judge GREENE concurs in the result with a separate concurring opinion.

Judge MARTIN concurs in the result and joins in Judge Greene's concurring opinion.

GREENE, Judge, concurring in the result.

[8] Although I agree with the result reached by the majority, the trial court's admission of the expert opinion that "A" was in fact sexually abused was error. The admission of this testimony, however, did not constitute plain error.

As the majority recognizes, an expert in a child abuse prosecution "cannot base [her] conclusions solely on the [child's] statements that [she has] been abused." *State v. Stancil*, 146 N.C. App. 234, 240, 552 S.E.2d 212, 215 (2001), *modified and aff'd*, 355 N.C. 266, 559 S.E.2d 788 (2002). Further, "in the absence of physical evidence to support a diagnosis of sexual abuse, expert testimony that sexual abuse has in fact occurred is not admissible because it is an impermissible opinion regarding the victim's credibility." *State v. Dixon*, 150 N.C. App. 46, 52, 563 S.E.2d 594, 598 (2002), *aff'd*, 356 N.C. 428, 571 S.E.2d 584 (2002) (per curiam).

In this case, Hebert, an expert witness,[1] testified "A" was in fact sexually abused. Specifically, she testified "A" 's relationship issues "almost certainly . . . at least in part relate back to the sexual abuse ["A"] experienced." This opinion was based on statements given to Hebert by "A." Indeed, Hebert testified she based her opinion on the responses she received from questions posed to "A." There is no testimony Hebert based her opinion of any physical evidence of sexual abuse. It was thus error to admit Hebert's opinion that "A" was sexually abused. *Dixon*, 150 N.C. App. at 52, 563 S.E.2d at 598; *see State v. Grover*, 142 N.C. App. 411, 418, 543 S.E.2d 179, 183 (2001), *aff'd*, 354 N.C. 354, 553 S.E.2d 679 (2001) (per curiam).

The admission of this expert testimony, however, does not rise to the level of plain error. The remaining evidence in this case, excluding the improper expert testimony, included testimony from: "A" that she had been sexually abused by Defendant; Defendant's ex-wife

_____

1. It is not disputed that Hebert was an expert witness in the field of child abuse.

about learning from "A" of the abuse; and Defendant's ex-wife's two other children who recounted, without objection, prior instances of abuse by Defendant. The evidence also included testimony from Hebert that victims of sexual abuse by a primary caretaker often exhibit problems with trust, confuse boundaries between themselves and others, have decreased self-esteem, and do not respect themselves and that "A" exhibited all these characteristics. Further, there was evidence Defendant and "A" were both treated for the same sexually transmitted disease at about the same time. Thus, even if the improper expert testimony is not considered, the remaining evidence in this case is such that it is not probable the jury would have reached a different result. *See State v. Perkins*, 154 N.C. App. 148, 152, 571 S.E.2d 645, 648 (2002).